**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**


**UNITED STATES OF AMERICA**

                                   **Docket No. 0315 1:15CR00030-0001**

       **vs.**

**BRUCE JOHNSON**


**DEFENDANT'S SENTENCING MEMORANDUM**


Defendant has been charged with Possession of Material Depicting the Sexual Exploitation of a Minor in violation of 18 U.S.C.C. 2252(a)(4)(B), 2252(b)(2). On August 1, 2016, he pled guilty to this crime. The Government has filed a Pre-Sentence Report in this case, which suggests the following:

- Base level of 18 -- 2G2.2(a)(1)

- 3 level reduction for his guilty plea -- 3E1.1(a) and (b)

- 2 level increase for depictions of minors younger than 12 -- 2G2.(b)(2)

- 4 level increase for depictions of violence -- 2G2.(b)(4)

- 2 level increase for use of a computer -- 2G2.(b)(6)

- 5 level increase for quantity of images -- 2G2.(b)(7)(D)

The PSIR suggests a total Offense Level of 28  which translates into a sentence of 78-97 months incarceration. However, the parties have agreed to a period of incarceration of 60 months. Defendant now respectfully requests this Court to approve this five-year agreement.

**Background**

Defendant, Bruce Johnson, is sixty-one years of age.  Over the years he has shown a commitment to work, and, despite major hip surgery, has always pursued employment. He is remorseful about his offense. He appears to pose little risk to anyone and seems likely to have a reduced risk of recidivism.  Given these circumstances, a sentence of the five years agreed to would be "sufficient, but not greater than necessary," to comply with the goals of sentencing set forth in 18 U.S.C. § 3553(a)(2).

As can be seen from the Presentence Report, Mr. Johnson has worked steadily since 1999. (PSR ¶ 51, 52) For the last several years he has been employed with Erie Metropolitan Transit Authority despite hip pain that has resulted in two surgeries. (PSR ¶ 45.) Mr. Johnson comes before the Court as an individual with a long and dependable work history who in the past used illegal controlled substances and alcohol but has maintained sobriety for the past eight years.  Despite the instant offense, there is reason to be optimistic about Mr. Johnson's future. The psychological testing conducted by Mr. Dowd suggests that Johnson has been a model patient, has a very low risk of relapse, and is unlikely to engage in any  more serious criminal conduct.

George J. Dowd has provided a report summarizing his observations of Defendant and his treatment summary. He explained that Defendant began therapy with Mr. Dowd on May 27, 2015. Mr. Dowd wrote that Defendant's sister, with whom he was extremely close, died in 2012 from cancer. Since that time, Defendant has suffered from depression and sadness. Exacerbating this was hip surgery in 2012 following which he was forced to use a fair amount of pain medication and was physically limited. This began his foray into adult pornography on the computer, through which he was able to temporarily escape his physical pain, his depression, his sadness over his sister's passing, and his dissatisfaction with his job.

While looking through adult pornography, occasionally child pornographic images would pop up. Defendant reported to Mr. Dowd that he was not sexually stimulated by these images but that he was curious and shocked. Additionally, he conveyed to Mr. Dowd that he never masturbated to child pornography, he has no attraction to children, he has never had any inappropriate contact with children, nor has he ever recorded, traded, manufactured, or posted child pornography on the internet. Further, he stated that he was not aware of the serious nature of the offense of possession of child pornography.

He also explained to Mr. Dowd that he has had several relationships with adult women, they all failed, and they left him feeling hopeless about finding a spouse. He also revealed to Mr. Dowd that his alcoholic father had been physically abusive to Defendant's mother.

Mr. Dowd wrote that Defendant has been truly remorseful for what he has done. Mr. Dowd wrote:

> He reports that he was looking at these images as the beauty of youth and not for sexual gratification in any way. He said it was more shock value and that he has no inclination toward children at all. He reports that he was impaired at the time, which led to his poor choices and judgment. He reports that he would never harm a child. He reports his only sexual inclination is toward adult women, not toward me, children or anything out of the ordinary. He reports that the child pornography just didn't seem real to him. There was a curiosity and shock value to it.

(Dowd Report at p. 5.)

Mr. Dowd went on to write that Defendant's "therapeutic involvement has been very good" at his weekly outpatient psychotherapy sessions. Id. at 5. "He has been very open and honest throughout the evaluation and treatment process. He has been cooperative and compliant. He has been a model patient, completing homework and reading assignments given to him to address depression and pornography issues. He has also addressed unresolved family of origin issues as well as unresolved grief issues regarding the loss of his sister." Id. at 5. Mr. Dowd

concluded that Defendant has "been very amenable to the treatment process and has developed coping skills to deal with his past issues as well as his current stressors. His relapse risk potential is extremely low. It is very doubtful that he would ever reoffend again." Id. at 5 (emphasis added). Finally, he added that Defendant's "prognosis appears very good at present based on his involvement in the psychotherapy process. He does not meet any of the criteria for a sexually violent predator." Id. at 6.

**18 U.S.C. 3553(a)**

The mandate of 18 U.S.C. § 3553(a) is for the court to "impose a sentence sufficient, but not greater than necessary, to comply" with the purposes of sentencing set forth in paragraph 2 of that same statute.  In United States v. Hunt, 459 F.3d 1180, 1182 (11th Cir. 2006), the court summarized the now often-quoted factors that a sentencing court must  consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
> (2) the need for the sentence imposed--
> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;
> (3) the kinds of sentences available;
> (4) the kinds of sentence and the sentencing range established [ . . .by the Sentencing Commission];
> (5) any pertinent [Sentencing Commission] policy statement . . .;
> (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims of the offense.

**The United States Sentencing Guidelines**

As recognized by Judge Tjoflat in United States v. Glover, 431 F.3d 744, 752-753 (11th

Cir. 2005), in some cases the Guidelines may have little persuasive force in light of some of the

other § 3553(a) factors:

> Although "judges must still consider the sentencing range contained in the
> Guidelines, . . . that range is now nothing more than a suggestion that may or may
> not be persuasive . . . when weighed against the numerous other considerations
> listed in [§ 3553(a) ]." Id. at 787 (Stevens, J., dissenting). Indeed, as one district
> judge has already observed,
>> the remedial majority in Booker [] direct[s] courts to consider all
>> of the § 3553(a) factors, many of which the guidelines either reject
>> or ignore. For example, under § 3553(a)(1) a sentencing court must
>> consider the "history and characteristics of the defendant." But
>> under the guidelines, courts are generally forbidden to consider the
>> defendant's age, his education and vocational skills, his mental and
>> emotional condition, his physical condition including drug or
>> alcohol dependence, his employment record, his family ties and
>> responsibilities, his socio-economic status, his civic and military
>> contributions, and his lack of guidance as a youth. The guidelines'
>> prohibition of considering these factors cannot be squared with the
>> § 3553(a)(1) requirement that the court evaluate the "history and
>> characteristics" of the defendant.

In Hunt, the court rejected "any across-the-board prescription regarding the appropriate

deference to give the guidelines." 459 F.3d at 1184. Instead, a "district court may determine, on

a case-by-case basis, the weight to give the Guidelines, so long as that determination is made

with reference to the remaining section 3553(a) factors that the court must also consider in

calculating the defendant's sentence." 459 F.3d at 1185. The reasoning in Hunt is consistent

with the United States Supreme Court's decision in Rita v. United States, 127 S.Ct. 2456, 2465

(2007), where the court recognized that "the sentencing court does not enjoy the benefit of a

legal presumption that the Guidelines sentence should apply." Thus, in Mr. Johnson's case, as in

any other, this "[C]ourt's Booker sentencing discretion presupposes no thumb on the scale in

favor of a Guidelines sentence." United States v. Wachowiak, No. 06-1643, 2007 WL

2189561*13 (7th Cir. August 1, 2007).

While it seems clear that the Guidelines do not enjoy any sort of presumption of

correctness at the trial level, there seems to remain the question of whether the propriety of any given sentence is still measured by the Guidelines. Some courts have continued to hold that a sentence other than a Guidelines sentence is warranted only if there are unusual or extraordinary circumstances present.  Mr. Johnson contends, however, that there is no need for the Court to find an unusual factor or a circumstance that is unique to the defendant.  Indeed, to require  an unusual factor or something unique to the defendant, is to give priority to the Guidelines and to ignore the holdings in <u>Hunt</u> and <u>Rita</u>:

> There have been suggestions in some recent appellate decisions that a district court may not vary from the guidelines unless it finds some factor unusual or unique to the defendant warranting the variance. It is difficult to see the basis for such a rule -- which sounds very much like the old departure standard -- in <u>Booker</u> or § 3553(a).  Moreover, such a rule improperly elevates the guidelines above the other factors set forth in § 3553(a). In essence, it makes the guidelines the objective measure of the sentence, and disallows any other sentence unless the court is able to explain why the guideline sentence is wrong. The district courts' limited departure authority did not save the guidelines in <u>Booker</u>, see 543 U.S. at 234-35, and if appellate restriction of sentencing discretion continues such that the new system begins to resemble the old, another disruption may be in the offing.

<u>United States v. Cull</u>, 446 F. Supp. 2d 961, 966 (E.D. Wis. 2006).  <u>See also</u> <u>United States v. Wallace</u>, 458 F. 3d 606, 613 (7th Cir. 2006) (" if <u>Booker</u> means anything at all, it must mean that the court was permitted to give further weight to a factor covered by a specific Guidelines adjustment . . .").

**Application of § 3553(a) to Mr. Johnson's Case**

In Mr. Johnson's case, it is the history and characteristics of the defendant that justify a lesser sentence: his personal growth that has led him to overcome a poor start;  his desire to work despite physical difficulties; and his low risk of recidivism. His traits show he has the character and the will to lead a productive life and to reject whatever attraction he has had to child

pornography.

Of the goals set out in 18 U.S.C. § 3553(a)(2), the Government and surely the Court consider carefully the need for the sentence to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" "to afford adequate deterrents to criminal conduct;" "to protect the public from further crimes of the defendant;" and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Mr. Johnson recognizes "the intrinsic harm done to children" in the production of child pornography in that the subsequent circulation of the images perpetrates the injury to the depicted child." United States v. Williams, 444 F. 3d 1286, 1291 (11th Cir. 2006). Accordingly, he recognizes that a significant sentence is in order. Nonetheless, especially with the command that the sentence "be sufficient, but not greater than necessary," a sentence of 60 months would still meet the goal that the sentence reflect the seriousness of the offense.

**Child Pornography**

Mr. Johnson's crime of child pornography is the type of offense that most find especially disturbing. Courts have recognized that such offenses are sometimes so repugnant that there is a risk that sentencing courts will disregard the requirements of sentencing. See United States v. Goff, No. 05-5524, 2007 WL 2445637, *8 (3rd Cir. August 20, 2007) ("child pornography is so odious, so obviously at odds with common decency, that there is a real risk that offenders will be subjected to indiscriminate punishment based solely on the repugnance of the crime and in disregard of other Congressionally mandated sentencing considerations."). Nonetheless, it is clear that the sort of considerations that apply to any case also apply to child pornography cases:

District judges' duty in sentencing child sex offenders is no different than it is in

any other case.  Child sex cases are not immune from the dictates of Booker.

United States v. Schmitt, No. 06-2207, 2007 WL 2241652, *5 (7th Cir. August 7, 2007).

Accordingly,  courts, relying on the discretion granted them by United States v. Booker, 543

U.S. 220, 125 S.Ct. 738 (2005) have been willing to  impose below-Guideline sentences in child

pornography cases.  See, e.g.: United States v. Gray, 453 F. 3d 1323 (11th Cir. 2003); United

States v. Halsema, 180 Fed. Appx. 103 (11th Cir. May 9, 2006); United States v. Cherry, 487 F.

3d at 372; United States v. Wachowiak, at *11; United States v. Baker, 445 F.3d 987 (7th Cir.

2006).  Even in those cases in which a below-Guidelines sentence  has been vacated the

argument typically has been, not that a below-Guidelines sentence was somehow inappropriate,

but that the extent of the variance was too great.  See, e.g. United States v. Fink, No. 06-3436,

2007 WL 2530312 (6th Cir. Sept. 7, 2007); United States v. Goff,  **501 F.3d 250 (2007)**; United

States v. Borho, 485 F. 3d 904 (6th Cir. 2007).

**Personal Computer Revolution**

Today almost every household owns a computer. See e.g.  Audrey Rogers, From Peer-to-

Peer Networks to Cloud Computing: How Technology Is Redefining

Child Pornography Laws, 87 St. John's L. Rev. 1013, 1028 (2013) (footnote omitted).  Relatedly,

the internet **r**evolution has completely altered individuals' ability to retrieve and share

information. As of January 2014, 87% of adults in the United States used the internet. Pew

Research Center, Internet User Demographics (Jan. 2014) (showing the large percentage of the

adult population in the United States using the internet in 2014), http://www.

pewinternet.org/data-trend/internet-use/latest-stats; see also Berkson v. Gogo LLC, 97 F. Supp.

3d 359, 377 (E.D.N.Y. 2015) (same). Concurrently, broadband connections have improved, with

higher-speed connectivity meaning that computer users spend more time online. Likewise, with

the advent and ubiquity of the smartphone, and the rise of the social media such as Facebook and

Instagram, individuals have developed entirely new ways of socially networking with others,

blurring the  boundaries between private and public. In the same vein, the use of the cloud to

store and share information has exponentially increased users' ability to view content effortlessly

and inexpensively.

      The Internet revolution has had a dramatic impact on the availability of pornography. As

the court explained in R.V., 2016 WL 270257,

> From July 2009 to July 2010, about 13% of Web searches were for erotic content."  To
> put the numbers in perspective, "Xvideos, the largest porn site on the web with 4.4 billion
> page views per month, is three times the size of CNN or ESPN, and twice the size of
> Reddit. LiveJasmin isn't much smaller. YouPorn, Tube8, and Pornhub—they're all vast,
> vast sites that dwarf almost everything except the Googles and Facebooks of the internet.

Id. (citing Sebastian Anthony, Just How Big Are Porn Sites?, ExtremeTech.com (Apr. 4, 2012),

http://www.extremetech.com/computing/123929-just-how-big-are-porn-sites). "Approximately

three quarters of men and half of women have intentionally viewed pornography over the

internet." Id. (citing Kelly M. Babchishin, et al., Online Child Pornography Offenders are

Different: A Meta-Analysis of the Characteristics of Online and Offline Sex Offenders Against

Children, 44 Arch. of Sexual Behav. 45, 45 (2015) (citation omitted)).

      These technological changes have made it incredibly easy to obtain and view

child pornography, as the Internet allows anonymity, availability, and affordability. Not only are

millions of sexually-explicit images or videos of minors on the internet, but this medium allows

for the rapid and cheap exchange of these images between users from all parts of the globe.  U.S.

Sentencing Comm'n, Federal Child Pornography Offenses (Dec. 2012), at 312-13 (footnote

omitted); see also Richard Wortley & Stephen Smallbone, U.S. Dep't of Justice, Off. of

Community Oriented Policing Servs., Child Pornography on the Internet, Problem-Oriented

Guides for Police Problem-Specific Guides Series No. 41 (May 2006),

http://www.popcenter.org/problems/pdefendants/ChildPorn.pdefendant, at 8 ("The Internet has

escalated the problem of child pornography by increasing the amount of material available, the

efficiency of its distribution, and the ease of its accessibility."); Kathryn C. Seigfried-Spellar, et

al., Internet Child Pornography, U.S. Sentencing Guidelines and the Role of Internet Service

Providers, 88 Inst. for Computer Scis., Soc. Informatics & Telecomm. Eng'r 17, 25 (2012)

("Researchers agree the amount of child pornography available via the Internet is unknown,

and its complete removal remains impossible.") (citation omitted; emphasis added). While in the

past, it could be difficult and expensive to obtain illegal images of child pornography, now it is

cheap or even free, and easy. One need not leave the confines of his home to retrieve massive

numbers of images and videos.

 Relatedly, the rise of peer to peer file sharing has changed the child pornography

landscape. A peer to peer network is a network of personal computers, each of which ats as both

a client and a server, so that each can exchange files and email directly with every other

computer on the network. Each computer can acces any of the others. A server network is a

computer network in which one centralized, powerful computer (called the server) is a hub to

which many less powerful personal computers or workstations (called clients) are connected.

The clients run programs and access  data that are stored on the server. Defendant would note

two things about peer to peer file sharing that are relevant in assessing the level of culpability of

his crime. When one searches websites on a browser for a particular item, particular websites

pop up and they are likely to contain the content searched for. This is because the website owners

have an incentive to use very accurate identifiers describing the website's content; if content

users know they can reliably find what they are looking for, they will return to the site,

increasing advertising profits and/or making the website otherwise more popular. However, those who are a part of a peer-to-peer file sharing group (in which all share images or videos or information with one another) do not have the same degree of incentive to accurately identify content of a file, since there is no advertising or other accouterments of a website. Thus, one may search for a particular image in a peer-to-peer file sharing group but the end up retrieving images not closely related to the targeted search. For example, one might search for sexual images of a child, but retrieve violent sexual content, which would be accompanied by a Sentencing Guideline offense level increase. In  the same vein, one may seek to retrieve a peer-to-peer file but, when doing so, the available identifiers for the file may not precisely identify the number of images included. So, one may download a file believed to contain one image when, in fact, it contains dozens or hundreds of images. Thus, one may easily and quickly end up with hundreds of illegal images on one's computer, resulting in a higher offense level score, despite not necessarily acting in a more culpable manner than another user who has ended up only downloading a few images.

What one judge has referred to as the "coincidence of technology and latent desire" has allowed for the easy access to child pornography and has allowed many such as Mr. Johnson to commit a crime that, in all likelihood, would never have been committed absent such easy access.  United States v. Cherry,  487 F.3d 366 (6th Cir. 2007). Mr. Johnson is not one who has displayed a willingness to go to great lengths to commit the offense. Surely a sentence of five years is sufficient to discourage those who commit the crime with so little effort.

**Varying Degrees of Culpability of Child Pornography Offenders**

Child pornography offenders include several distinct subgroups of varying dangerousness to children:

> Recreational users access child pornography on impulse or out of curiosity based on a penchant for pornography and a desire to look at a wide range of pornographic material. Sexual compulsive users view child pornography because of the extremeness of its content rather than a particular preference for children. Preferential offenders mostly consist of pedophiles with a definite preference for children. Miscellaneous offenders consist of media reporters and concerned citizens who have crossed the line from investigation into offending, as well as pranksters and older teenagers attempting to sexually interact with younger teenagers. Profiteers do not necessarily enjoy looking at child pornography but rather use it for financial gain.

United States v. R.V., 2016 WL 270257 (E.D.N.Y Jan. 21, 2016) (citing Jason Scheff, Disproving the "Just Pictures" Defense: Interrogative Use of the Polygraph to Investigate Contact Sexual Offenses Committed by Child Pornography Suspects, 68 N.Y.U. Ann. Surv. Am. L. 603, 635-36 (2013) (footnotes omitted)). Research has shown that non-production child pornography offenders—people who possess, acquire or distribute images of child sexual exploitation—are not necessarily pedophiles nor child molesters.  In fact, several reports have found that, generally, child pornography offenders are "at low risk to commit hands-on sexual assaults of children." United States v. R.V., 2016 WL 270257 (E.D.N.Y Jan. 21, 2016) (citing Austin F. Lee, et al., Predicting Hands-On Child Sexual Offenses Among Possessors of Internet Child Pornography, 18 Psych., Pol. & Law 644, 668 (2012); see also Hannah Lena Merdian et al., The Three Dimensions of Online Child Pornography Offending, 19 J. of Sexual Aggression 121, 123 (2013) (summarizing studies and concluding that "[f]or most offenders, their online offending has no behavioural link to contact sex offending"); Carissa Byrne Hessick, Disentangling Child Pornography from Child Sex Abuse, 88 Wash. U. L. Rev. 853, 875 (2011)  (noting that "the empirical literature is unable to validate the assumption that

there is a causal connection between possession of child pornography and child sex abuse.").

Studies have shown that:

> [W]hile child molesters may possess child pornography, those that possess
> child pornography are generally not likely to engage in contact offenses against children.
> Instead, child molesters, are merely a small subset of child pornographers. Or, another
> way to look at it is that child molesters and child pornography offenders are two groups
> with occasional overlap in membership. . . . Contrary to what may appear logical, the
> correlation between pedophilia and sexual contact offenses against children is not very
> strong.

R.V., 2016 WL 270257 (citing Hamilton, The Efficacy of Severe Child Pornography Sentencing:

Empirical Validity or Political Rhetoric?, 22 Stan. L. Pol'y Rev. 545, 580-81 (2011) (footnotes

omitted)).

Most non-production child pornography offenders  - including Defendant Johnson - show

no mens rea suggesting the likelihood of future harm to children. While the Sentencing

Guidelines and their accompanying Offense Levels address some of the aspects rendering

possessory-only offenses substantively different from less passive crimes, Defendant asserts that

the Guidelines do not show a full cognizance of the differing levels of culpability with the result

that the Guidelines are likely to point to excessively long sentences for the possession-only

defendants.

The Court of Appeals for the Second Circuit has recognized the dearth of data on critical

issues affecting risks, dangers, and appropriate sentences in these cases. United States v. Dorvee,

616 F.3d 174, 183 (2d Cir. 2010)  (finding error in sentencing court's "apparent assumption"

concerning the link between possession of child pornography and risk of acting out); United

States v. Falso, 544 F.3d 110, 122 (2d Cir. 2008) (finding error in district court's reliance on

defendant's history of sexual abuse of minor and general "proclivities" of child pornographers in

finding probable cause to issue a search warrant in child pornography investigation); see also United States v. Stern, 590 F. Supp. 2d 945 (N.D. Ohio 2008) (recognizing the difference in culpability between viewing and producing child pornography as well as the wide variation of sentences in child pornography cases); R.V., 2016 WL 270257, at *23 (describing how "[a]utomatically equating non-production child pornography offenders—people who possess, acquire or distribute images of child sexual exploitation—with pedophiles or child molesters is misleading."). And yet "[t]he irony. . . is that the Guidelines actually punish some forms of direct sexual contact with minors more leniently than possession or distribution of child pornography." U.S. v. Dorvee, 616 F.3d 174, 184 (2d Cir. 2010). Defendant suggest that this Court, too, sentence him against the backdrop of scientific, empirical peer-reviewed studies showing only a weak correlation between passive possession of child pornography and assaultive type offenses.

**Recidivism**

Recent research suggests that the recidivism rate of child pornography offenders may be low, with most child pornography viewers unlikely to engage in future sexual offenses. R.V., 2016 WL 270257 (citing Richard B. Krueger & Meg S. Kaplan, Non-Contact Sexual Offenses: Exhibitionism, Voyeurism, Possession of Child Pornography, and Interacting with Children Over the Internet, ECF No. 44 (unpublished manuscript), at 51-52 (describing a 2010 study of child pornography offenders by Seto, Hanson and Babchishin which "revealed that 4.6% of online offenders committed a new sexual offense during the 1.5 to 6 year follow-up period; 2.0% committed a contact sexual offense, and 3.4% committed a new child pornography offense. The authors suggested that there could be a distinct subgroup of online-only offenders who posed a relatively low risk of committing contact sexual offenses in

the future.") (emphasis added); see also  Sentencing Comm'n, Federal

Child Pornography Offenses, at 310 (the Commission's recidivism study of 610 non-production

offenders showed that the offenders' "general recidivism rate . . . was 30.0 percent during an

average follow-up period of eight and one-half years after the offenders' reentry into the

community" while the offenders' "known sexual recidivism rate, a subset of the general

recidivism rate, was 3.6 percent.").

      The United States Sentencing Commission itself has commented:

> The known general recidivism rate for federal non-production offenders studied by the
> Commission was 30.0 percent during an average follow-up period of eight and one-half
> years after the offenders' reentry into the community. Those offenders' known sexual
> recidivism rate, a subset of the general recidivism rate, during that same follow-up period
> was 7.4 percent. The known "contact" sexual recidivism rate, a subset of the overall
> sexual recidivism rate, was 3.6 percent. Because

http://www.ussc.gov/sites/default/files/pdefendant/news/congressional-testimony-and-

reports/sex-offense-topics/201212-federal-child-pornography-offenses/Chapter_11.pdefendant *

18. It continued:

> General recidivism was measured by arrests for or convictions of any felony or serious
> misdemeanor offense (including sex offender registration violations) as well as
> "technical" violations of the conditions of supervision resulting in an arrest or revocation.
> The Commission found that the offenders' rate of sexual recidivism, which is a subset of
> general recidivism, was 7.4 percent (45 of the 610 offenders). Sexual recidivism was
> measured by arrests for or convictions of a sexual offense (including a new child
> pornography offense but excluding a sex offender registration violation). Twenty-two of
> those 45 offenders (or 3.6% of the 610 offenders) were arrested for or convicted of sexual
> "contact" offenses.

http://www.ussc.gov/sites/default/files/pdefendant/news/congressional-testimony-and-

reports/sex-offense-topics/201212-federal-child-pornography-offenses/Chapter_12.pdefendant *

9.

Like the studies examining the relationship between child pornography possession and assaultive offenses, it appears that studies considering the recidivism rates of child pornography possession-only offenders support the notion that lengthy prison sentences are not necessarily warranted.

**Trend toward lesser sentences for possessory-only offenses**

A survey by the Sentencing Commission demonstrated that about seventy percent of federal judges considered the Guidelines for child pornography possession and receipt too severe. U.S. Sentencing Comm'n, Results of Survey of United States District Judges January 2010 through March 2010 (June 2010), at 13. A subsequent report by the Sentencing Commission recorded an increasing trend in sentencing below the Guidelines range for non-production cases. A variety of stakeholders in the federal criminal justice system, including the Department of Justice, the defense bar, and many in the federal judiciary, are critical of the current non-production penalty scheme. Although these stakeholders are not unanimous concerning the perceived flaws in the penalty scheme, many believe that it fails to adequately differentiate among offenders based on their culpability and sexual dangerousness, needs to be updated to reflect recent changes in typical offense conduct associated with the evolution of computer and Internet technologies, and is too severe for some offenders. As a result, courts and parties increasingly have engaged in charging and sentencing practices that have limited many offenders' sentencing exposure. U.S. Sentencing Comm'n, Federal

Child Pornography Offenses, at xii. A strong judge-initiated trend of departing downward for defendants in child pornography offenses has emerged in recent years: Jeffrey T.

Ulmer, Mismatch of Guidelines and Offender Danger and Blameworthiness Departures as Policy Signals from the Courts, 13 Criminology & Pub. Pol'y 271, 275 (2014). In departing downward,

district judges nationwide have spoken out against the harsh Guidelines sentences for

child pornography offenders. See, e.g., United States v. Kelly, 868 F. Supp. 2d 1202, 1211

(D.N.M. 2012) (defendant received and downloaded 580 images of child pornography;

"[Defendant]'s advisory Guideline sentence of 87 to 108 months imprisonment is far greater than

necessary to punish and deter his conduct and protect the public. This is largely due to serious

flaws in U.S.S.G. § 2G2.2, which was not drafted pursuant to the Sentencing Commission's usual

expertise, and all too frequently generates unjustly excessive terms of incarceration."); United

States v. Marshall, 870 F. Supp. 2d 489, 491-92 (N.D. Ohio 2012) ("Under the Guidelines, some

of the recommended sentences for viewers can, with enhancements, be higher than those for

actual predators . . . . In effect, the Guidelines presume that those who view

child pornography are indistinguishable from those who actually abuse children."); United States

v. Stark, No. 10-CR-270, 2011 WL 555437, at *7 (D. Neb. Feb. 8, 2011) (defendant downloaded

over 100 image files, and had multiple hard drives containing over 2,000 images, 5,000 videos,

and 650,000 images of child erotica; "[T]he child pornography Guidelines are driven by

Congressional directive and are not grounded in any scientific, statistical, or empirical method . .

. . Although downloading child pornography is hardly a harmless activity, it is not the equivalent

of direct physical abuse or sexual molestation of children, or production

of pornography involving children. The court finds that the ranges of imprisonment

recommended under the Guidelines may be appropriate for a sexual predator, but are not a

reliable appraisal of a fair sentence in this case."); United States v. Price, No. 09-CR-30107,

2012 WL 966971, at *12 (C.D. Ill. Mar. 21, 2012) (images of defendant's daughter along with

937 still images and 21 videos of other children alleged to be child pornography where found on

defendant's computer; "[C]hild pornography crimes fall within a spectrum . . . . This Court finds

that a below-Guideline sentence is needed in this case in order to avoid unwarranted sentencing disparities but also to avoid unwarranted sentencing similarities among defendants convicted of dissimilar conduct."); United States v. Cameron, No. 09-CR-00024, 2011 WL890502, at *4 (D. Me. Mar. 11, 2011) ("[Defendant] is subject to nearly a ten-fold greater punishment for possessing images of someone else sexually abusing a minor than he would receive if he had committed the actual abuse himself."); United States v. Beiermann, 599 F. Supp. 2d 1087, 1105 (N.D. Iowa 2009) (defendant pled guilty to knowingly transporting, receiving, and possessing child pornography across state lines, in total 2,600 images of potentially 370 different victims; "This guideline, thus, blurs logical differences between least and worst offenders, contrary to the goal of producing a sentence no greater than necessary to provide just punishment . . . . The sentencing court must consider the need to avoid unwarranted similarities among defendants who are not similarly situated, as well as unwarranted disparities among defendants who are similarly situated."); United States v. Cruikshank, 667 F. Supp. 2d 697, 702 (S.D. W. Va. 2009) (defendant convicted of possessing or knowingly accessing with intent to view child pornography; "There is nothing redeeming or even understandable about this crime. But judges must objectively consider whether the sentences imposed further the goals of punishment. To do so, we must differentiate between those who create child pornography and those who consume it . . . . In an instance of troubling irony, an individual who, sitting alone, obtained images of sexually exploited children on his computer, could receive a higher sentence than the Guidelines would recommend for an offender who actually rapes a child."); United States v. Burns, No. 07-CR-556, 2009 WL 3617448, at *7-8 (N.D. Ill. Oct. 27, 2009) (defendant was convicted on two counts of receiving and distributing child pornography with a "relatively small collection of illegal images"; sentenced to 72 months, below Guidelines' range of 235-293

months); United States v. Meysenburg, No. 08-CR-361, 2009 WL 2948554, at *8 (D. Neb. Sept. 11, 2009) ("Possession of pornography is the least serious of the crimes on the continuum of conduct—from possession to distribution to production to predatory abuse—that exploit children. One who possesses child pornography is considerably less culpable than one who produces or distributes the exploitative materials and a possessor is a marginal player in the overall child exploitation scheme."); United States v. Johnson, 588 F. Supp. 2d 997, 1004-07 (S.D. Iowa 2008) (refusing to "give too much weight to the sentencing guidelines, given their lack of empirical support" and finding that a sentence well below the Guidelines range was warranted); United States v. Grober, 595 F. Supp. 2d 382, 393 (D.N.J. 2008), aff'd, 624 F.3d 592 (3d Cir. 2010) (defendant convicted of downloading 1500 images and 200 videos of child pornography; "§ 2G2.2 leads to a sentence that is too severe in a downloading case. Surely congress did not intend to provide a sentencing range of 19 ½ to 20 years for a typical downloader, especially one who pleads guilty. Aside from overly punitive sanctions for a first offender, the guidelines sentence for a typical downloader squelches the ability of a judge to depart upward. The bottom line is that the skewed focus in § 2G2.2 on content and the strained application to conduct . . . lead to a vision whereby the predator becomes indistinguishable from the voyeur.").

Courts have noted the comparatively lower culpability of defendants convicted of possessing child pornography, as opposed to distribution, production and physical abuse. With respect to defendants convicted only of possession offenses, courts have increasingly imposed sentences with minimal or no incarceration. See, e.g., R.V., 2016 WL 270257, at *44 (imposing a sentence of time served and seven years of supervised release);  United States v. Autery, 555 F.3d 864, 867 (9th Cir. 2009) (affirming non-Guidelines sentence of five years of probation for

possession of child pornography); United States v. Stall, 581 F.3d 276, 277-78 (6th Cir. 2009)

(affirming non-Guidelines sentence of one day of incarceration followed by ten-year period of

supervised release for defendant convicted of two counts of possession of child

pornography); United States v. Prisel, 316 F. App'x 377, 378 (6th Cir. 2008) (affirming non-

Guidelines sentence of one day in prison followed by eighteen months of home confinement for

possession of child pornography); United States v. Rowan, 530 F.3d 379, 380 (5th Cir.

2008) (affirming non-Guidelines sentence of five years of probation and no period of

incarceration for possession of child pornography); United States v. D.M., 942 F. Supp. 2d 327,

352 (E.D.N.Y. 2013) (sentencing defendant who pled guilty to one count of possession of

child pornography to five years' probation);  United States v. Polito, 215 F. App'x 354, 355 (5th

Cir. 2007) (per curiam) (affirming non-Guidelines sentence of five years of probation with one

year of house arrest for possession of child pornography); United States v. Crespo-Rios, No. 08-

CR-208, 2015 WL 6394256, *1 (D.P.R., Oct. 19, 2015) (holding "that resentencing Defendant to

the same sentence—that is, time served followed by a long period of supervised release—is

justified in view of each of the sentencing factors outlined in 18 U.S.C. § 3553"); United States

v. Mallatt, No. 13-CR-3005, 2013 WL 6196946, at *13 (D. Neb. Nov. 27, 2013) ("sentence of

time served, followed by six years of supervision with special conditions including intensive

treatment is adequate to fulfill the goals of sentencing in this case"); United States v. Diaz, 720

F. Supp. 2d 1039, 1048 (E.D. Wis. 2010) (imposing non-Guidelines sentence of six months of

incarceration followed by twelve years' supervised release); United States v. Meillier, 650 F.

Supp. 2d 887, 887 (D. Minn. 2009) (imposing non-Guidelines sentence of one day of

confinement followed by thirty years of supervised release); United States v. Boyden, No. 06-

CR-20243, 2007 WL 1725402, at *10 (E.D. Mich. June 14, 2007) (imposing non-Guidelines

sentence of one day of confinement followed by three years of supervised release, the first year

of which to be served in a community correctional facility); United States v. Evren, No. 10-CR-

131 (E.D.N.Y. Feb. 26, 2013) (ECF No. 59) (imposing non-Guidelines sentence of three years of

probation for defendant who pleaded guilty to one count of possession of child pornography); see

also United States v. Morace, 594 F.3d 340, 351 n. 10 (4th Cir. 2010) (noting "that some district

courts have begun sentencing defendants convicted of possessing child pornography to one day

of incarceration followed by a term of supervised release"); United States v. Evren, No. 10-CR-

131 (E.D.N.Y Feb. 26, 2013) (ECF No. 59) (imposing non-Guidelines sentence of three years of

probation for defendant who pleaded guilty to one count of possession of child pornography).

    In fact, the rate of non-production cases in which sentences were imposed within the

applicable guideline range steadily fell from its high point in fiscal year 2004, at 83.2 percent of

cases, to 40.0 percent of cases in fiscal year 2010, and to 32.7 percent of cases in fiscal year

2011. http://www.ussc.gov/sites/default/files/pdefendant/news/congressional-testimony-and-

reports/sex-offense-topics/201212-federal-child-pornography-offenses/Chapter_06.pdefendant at

*48.

    This trend in lesser sentences is consonant with jurors' attitudes about appropriate

punishment in these sorts of cases. Recently in  U.S. v. Collins, (6th Cir. June 29, 2016)

(unpublished) the government appealed the defendant's concurrent five-year sentences for

receiving and distributing child pornography, 18 U.S.C. § 2252(a)(2), and possessing child

pornography, 18 U.S.C. § 2252A(a)(5)(B); the appellate court affirmed. The defendant's

calculated sentencing guidelines range was 262 to 327 months, above the statutory twenty-year

maximum for his offenses. See 18 U.S.C. §§ 2252(b)(1), 2252A(b)(1). At sentencing, District

Court Judge James S. Gwin revealed that, after the verdict, he "polled the jury to ask them . . .

'State what you believe an appropriate sentence is.'" Jurors' responses ranged from zero to 60 months' incarceration, with a mean of 14.5 months and median of 8 months. With one exception, every juror recommended a sentence less than half of the five-year mandatory minimum accompanying defendant's offenses. See 18 U.S.C. §§ 2252(b)(1), 2252A(b)(1). Each juror's recommendation was but a fraction of defendant's calculated guidelines range. Over the government's objection, the district judge considered the jury poll as "one factor" in fashioning defendant's sentence, noting that it "reflect[s] . . . how off the mark the Federal Sentencing Guidelines are." After discussing numerous sentencing factors under 18 U.S.C. § 3553(a), the district judge varied downward, sentencing defendant to concurrent mandatory minimum terms of five years' imprisonment.

**Commission's own questioning about Guidelines**

While the Guidelines are generally developed by the Commission through empirical studies focused on data about past sentencing practices, this was not the case for child pornography offenses. The Guidelines were amended at the direction of Congress. The Commission apparently opposed the harsher penalties imposed by the legislature. See U.S. Sentencing Comm'n, The History of the Child Pornography Guidelines (Oct. 2009); Dorvee, 616 F.3d at 184-86 (http://www.ussc.gov/sites/default/files/pdefendant/research-and-publications/researchprojects-and-surveys/sex offenses/20091030_History_Child_Pornography_Guidelines.pdefendant.); see also United States v. Diaz, No. 11-CR-821, 2013 WL 322243, at *3 (E.D.N.Y. Jan. 28, 2013) (providing that the authority for a non-Guidelines sentence "is at its greatest when the offense Guideline at issue is not the product of the Commission's empirical analysis and technical expertise").

In 2012, the Commission completed a multi-year examination of "offenders sentenced under the federal sentencing guidelines and corresponding penal statutes concerning child pornography offenses." U.S. Sentencing Comm'n, Federal Child Pornography Offenses, at i. The Commission was especially concerned with the Guidelines applicable to non-production child pornography offenses and the extent to which they managed to meaningfully distinguish among different offenders' levels of culpability. As explained in the resulting report, "several factors" prompted the Commission's examination:

> First, during the past two decades, cases in which offenders have been sentenced under the child pornography guidelines, while only a small percentage of the overall federal criminal caseload, have grown substantially both in total numbers and as a percentage of the total caseload.
>
> Second, since the enactment of the PROTECT ACT of 2003 and United States v. Booker, which made the guidelines "effectively advisory" in 2005, there has been a steadily decreasing rate of sentences imposed within the applicable guidelines ranges in nonproduction cases . . . . These sentencing data indicate that a growing number of courts believe that the current sentencing scheme in nonproduction offenses is overly severe for some offenders . . . .
>
> Third, as a result of recent changes in the computer and Internet technologies that non-production offenders use, the existing sentencing scheme in non-production cases no longer adequately distinguishes among offenders based on their degree of culpability. Non-production child pornography offenses have become almost exclusively Internet-enabled crimes; the typical offender today uses modern Internet-based technologies such as peer-to-peer ("P2P") file-sharing programs that were just emerging a decade ago and now facilitate large collections of child pornography. The typical offender's collection not only has grown in volume but also contains a wide variety of graphic sexual images (including images of very young victims), which are now readily available on the internet. As a result, four of the six sentencing enhancements in § 2G2.2—those relating to computer usage and the type and volume of images possessed by offenders, which together account for 13 offense levels—now apply to most offenders and, thus, fail to differentiate among offenders in terms of their culpability. These enhancements originally were promulgated in an earlier technological era, when such factors better served to distinguish among offenders. Indeed, most of the enhancements in § 2G2.2, in their current or antecedent versions, were promulgated when the typical offender obtained child pornography in printed form in the mail.

Fourth, recent social science research—by both the Commission and outside researchers—has provided new insights about child pornography offenders and offense characteristics that are relevant to sentencing policy. This research includes information regarding the prevalence of child pornography offenders' criminal sexually dangerous behavior both before their arrests and after their ultimate reentry into the community following their convictions, as well as emerging research on the efficacy of psycho-sexual treatment of offenders' clinical sexual disorders.

Finally, most stakeholders in the federal criminal justice system consider the nonproduction child pornography sentencing scheme to be seriously outmoded. Those stakeholders, including sentencing courts, increasingly feel that they "are left without a meaningful baseline from which they can apply sentencing principles" in nonproduction cases.

Id. at i-ii (emphasis added).

The Commission concluded that "revisions are needed to more fully differentiate among offenders based on their culpability and sexual dangerousness." *Id. at 311. Recommended by the Commission was that "the non-production child pornography sentencing scheme should be revised to account for recent technological changes in offense conduct and emerging social science research about offenders' behaviors and histories, and also to better promote the purposes of punishment by account for the variations in offenders' culpability and sexual dangerousness." Id. at xvii. It also recommended that Congress "amend the statutory scheme to align the penalties for receipt and possession offenses." The distinction between the conduct, according to the Commission's review of over 2,000 non-production cases, was "indistinguishable." Id. at xix, xx.

The Sentencing Commission itself has repeatedly requested that Congress review sentencing for child pornography cases, particularly the imposition of mandatory minimums. See U.S. Sentencing Comm'n, Federal Child Pornography Offenses, at 320-31; U.S. Sentencing Comm'n, The History of the Child Pornography Guidelines. Yet, Congress has not acted. For a congressperson, addressing child pornography is akin to stepping onto the third rail. The net

result of congressional inaction has been that inconsistent and long sentences that destroy not only the individual but the family and community have sometimes been ordered.

In sum, there are widely shared concerns about the propriety of the Sentencing Guidelines for child pornography offenses given the evidence about recidivism, possessory-only offenses, and their lack of correlation with contact/assault type crimes. The Sentencing Commission itself as well as judges have expressed their concern that Guideline sentences may not be commensurate with the culpability of these types of offenders.

**Use of a Computer -- U.S.S.G. 2G2.(b)(6)**

Not only do the Guidelines generally fail to accurately assess the culpability of those charged with child pornography, but in this specific case, the Offense Levels assigned to Defendant in the PSIR overstate the seriousness of his crime.

The purpose motivating the Sentencing Guidelines is to distinguish between the culpability of different offenders and distinguish those factors which make a crime more or less reprehensible. However,  with child pornography, the Offense Levels utilized are so commonly added that the net effect is to blur the lines between levels of culpability.  As one court has commented:

> The § 2G2.2 sentencing enhancements routinely result in Guidelines projections near or exceeding the statutory maximum, even in run-of-the-mill cases. Many of the § 2G2.2 enhancements apply in nearly all cases. Of all sentences under § 2G2.2 in 2009, 94.8% involved an image of a prepubescent minor (qualifying for a two-level increase pursuant to § 2G2.2(b)(2)), 97.2% involved a computer (qualifying for a two-level increase pursuant to § 2G2.2(b)(6)), 73.4% involved an image depicting sadistic or masochistic conduct or other forms of violence (qualifying for a four-level enhancement pursuant to § 2G2.2(b)(4)), and 63.1% involved 600 or more images (qualifying for a five-level enhancement pursuant to § 2G2.2(b)(7)(D)).

U.S. v. Dorvee, 616 F.3d 174, 186 (2d Cir. 2010) (internal citations omitted). That same court

continued:

> In sum, these enhancements, which apply to the vast majority of defendants sentenced
> under § 2G2.2, add up to 13 levels, resulting in a typical total offense level of 35. An
> ordinary first-time offender is therefore likely to qualify for a sentence of at least 168 to
> 210 months, rapidly approaching the statutory maximum, based solely on sentencing
> enhancements that are all but inherent to the crime of conviction. Consequently,
> adherence to the Guidelines results in virtually no distinction between the sentences for
> defendants like Dorvee, and the sentences for the most dangerous offenders who, for
> example, distribute child pornography for pecuniary gain and who fall in higher criminal
> history categories. This result is fundamentally incompatible with § 3553(a). By
> concentrating all offenders at or near the statutory maximum, § 2G2.2 eviscerates the
> fundamental statutory requirement in § 3553(a) that district courts consider "the nature
> and circumstances of the offense and the history and characteristics of the defendant" and
> violates the principle, reinforced in Gall, that courts must guard against unwarranted
> similarities among sentences for defendants who have been found guilty of dissimilar
> conduct.

Dorvee, 616 F.3d at 186-87 (internal citations omitted).

Herein, the Presentence Report recommends an increase of two levels under U.S.S.G.

2G2.(b)(6), for Defendant's use of a computer. Defendant argues that application a two-level

increase to his offense level for the use of a computer would constitute an impermissible "double

counting" because his charged offense already contemplates the use of a computer to commit it.

In addition, such an increase would be improper because it applies in almost every case of

possession, receipt, or distribution of child pornography, and therefore fails to achieve a

meaningful separation between low-grade offenders and those who pose a higher threat to the

community.

"Double counting occurs when precisely the same aspect of a defendant's conduct factors

into his sentence in two separate ways." U.S. v. Walters, 775 F.3d 778, 782 (6th Cir.

2015) (internal quotation marks removed). "[N]o double counting occurs if the defendant is

being punished for distinct aspects of his conduct." United States v. Battaglia, 624 F.3d 348, 351

(6th Cir. 2010). Double counting is permitted where "it appears that Congress or the Sentencing Commission intended to attach multiple penalties to the same conduct." Id.

Defendant has been charged with the following offense:

18 U.S.C. § 2252. Certain activities relating to material involving the sexual exploitation of minors

(a) Any person who-

. . .

(4) either-

. . .

(B) knowingly possesses, or knowingly accesses with intent to view, 1 or more books, magazines, periodicals, films, video tapes, or other matter which contain any visual depiction that has been mailed, or has been shipped or transported using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce, or which was produced using materials which have been mailed or so shipped or transported, by any means including by computer, if-

(i) the producing of such visual depiction involves the use of a minor engaging in sexually explicit conduct; and

(ii) such visual depiction is of such conduct;

shall be punished as provided in subsection (b) of this section.

. . .

(2) Whoever violates, or attempts or conspires to violate, paragraph (4) of subsection (a) shall be fined under this title or imprisoned not more than 10 years, or both, but if any visual depiction involved in the offense involved a prepubescent minor or a minor who had not attained 12 years of age, such person shall be fined under this title and imprisoned for not more than 20 years, or if such person has a prior conviction under this chapter, chapter 71, chapter 109A, or chapter 117, or under section 920 of title 10 (article 120 of the Uniform Code of Military Justice), or under the laws of any State relating to aggravated sexual abuse, sexual abuse, or abusive sexual conduct involving a minor or ward, or the production, possession, receipt, mailing, sale, distribution, shipment, or transportation of child pornography, such person shall be fined under this title and imprisoned for not less than 10 years nor more than 20 years.

Here, Johnson's indictment charged him under 18 U.S.C. § 2252(a)(4)(B) and 18 U.S.C. § 2252(b)(2), which targets the receipt or possession of a visual depiction of a minor engaging in sexually explicit conduct "by any means including by computer."

The computer use enhancement should not apply because virtually every offender uses a computer to commit the crime. What is the practical effect of the Guidelines' implementation over time? Though only a minority of offenders committed the offense with a computer when the enhancement was first promulgated, now almost all of them use a computer to do so. Based on this shift, "the enhancement is, for all intents and purposes, part-and-parcel of the offense." See, e.g.,  United States v, Marshall, 870 F. Supp. 2d 489, 494 (N.D. Ohio 2012). Some district courts have, on that basis, declined to apply the enhancement. In United States v. Elmore, for example, the court noted that the district court had "removed the two-level enhancement for use of a computer" though it "agreed that there `was a legal basis on that [enhancement].'"  743 F.3d 1068, 1071 (6th Cir. 2014). The district court in Marshall also opted not to apply the enhancement, cataloguing numerous policy grounds for its decision. 870 F. Supp. 2d at 493-95.

Likewise, in United States v. Klepper, the district court declined to apply the PSR-recommended computer enhancement, but applied other Guidelines-recommended enhancements. 520 F. App'x 392, 393 (6th Cir. 2013). When the plaintiff appealed to challenge the other enhancements, the appellate court noted that the "district court here plainly recognized its authority to reject application of the enhancements, as it did with regard to the enhancement for use of a computer." Id. The appellate court affirmed, holding that "[o]ther courts, including our own, have noted that a district court may vary from the Guidelines based on a policy disagreement, but it is not required to do so." Id.

**Number of images**

Similarly, Defendant's PSIR recommends a five level increase for quantity of images

pursuant to 2G2.(b)(7)(D). The United States Sentencing Commission's 2012 Report to

Congress regarding Child Pornography Offenses notes:

> The current sentencing scheme in §2G2.2 places a disproportionate emphasis on
> outmoded measures of culpability regarding offenders' collections (e.g., a 5-level
> enhancement under §2G2.2(b)(3)(B) for possession of 600 or more images of child
> pornography, which the typical offender possesses today).

http://www.ussc.gov/sites/default/files/pdefendant/news/congressional-testimony-and-

reports/sex-offense-topics/201212-federal-child-pornography-offenses/Chapter_12.pdefendant *

11. The Report continues:

> The current penalty scheme in non-production cases focuses primarily on an offender's
> child pornography collection. Three of the six enhancements in §2G2.2 concern the
> content of offenders' collections: (1) a 2-level enhancement for possession of images of a
> pre-pubescent minor, (2) a 4-level enhancement for possession of sado-masochistic
> images or other depictions of violence, and (3) a 2- to 5-level enhancement for
> collections of a certain number of images (with increments ranging from ten or more
> images to 600 or more images). Because these three provisions (including the maximum
> 5-level enhancement for possession of 600 or more images) now apply to a majority of
> offenders, they add a significant 11-level cumulative enhancement based on the content
> of the typical offender's collection. The current guideline thus does not adequately
> distinguish among most offenders regarding their culpability for their collecting
> behaviors. Furthermore, the 11-level cumulative enhancement, in addition to base offense
> levels of 18 or 22,59 results in guideline ranges that are overly severe for some offenders
> in view of the nature of their collecting behavior.

Id. *12-13. Defendant suggests that the five level increase in his score places undue emphasis on

the number of images found on his computer, particularly in light of the previously described

practicalities of peer to peer file sharing, which tend to prevent receivers of images from

controlling the number of images obtained from others in one file. In sum, Defendant suggests

that application of 2G2.(b)(7)(D) in his case results in too-high of a sentence, supporting the

propriety of the 60 month sentence to which he has agreed.

**SORNA**

The Sentencing Guidelines fail to take into account the effects of SORNA on Defendant's future. Pursuant to See 42 Pa.C.S. § 9799.14(b)(12) (listing convictions for 18 U.S.C. § 2252(a)(4) as a Tier I offense), Defendant will be classified as a Tier I offender and required to register for fifteen years. These stringent registration requirements along with all the repercussions of being listed on the SORNA database will address many of the policies motivating the guideline calculations assigned to him.

In addition to the conditions of his supervised release, Johnson will be subject to prolonged and severe sex offender registration requirements under federal law as well as Pennsylvania law.  Such post-release conditions represent exacting collateral consequences which serve to deter future criminal conduct. Lawrence v. Texas, 539 U.S. 558, 575 (2003) (recognizing that the "stigma" imposed for violation of sex crime statute "is not trivial"); United States v. Mateo, 299 F. Supp. 2d 201, 209-10 (S.D.N.Y. 2004) ("[B]eyond the offender's actual deprivation of liberty when incarcerated, a host of other penalties and burdens always attend criminal conviction, to name a few: losses of family life, of socioeconomic status, of employment and career opportunities; diminution of certain civil rights and entitlements; and countless humiliations and indignities commonly associated with living in confinement."); Model Penal Code: Sexual Assault and Related Offenses, General Commentary at 12 (Am. Law. Inst., Discussion Draft No. 2, 2015) ("[T]he treatment of sex offenders has borne many of the hallmarks of an unjustifiably punitive state. For instance, sex offenders as a class have been subjected to some of the most unforgiving and indiscriminate collateral consequences of conviction, such as unduly severe residency restrictions or registration requirements.").

Defendant may have to comply with strict supervision requirements, including the monitoring of his computer and polygraph testing, which are likely to adversely impact his employment as well as his family and social life.  42 U.S.C. § 16913 (federal sex offender registration and notification requirements); 18 U.S.C. § 3583(k) (supervised release term for federal sex offenders); see also Pa. 42 Pa.C.S. § 9799.14(b)(12). Defendant will have to live with the serious collateral consequences of his conviction: he will perpetually bear the scarlet letter that comes with being a convicted felon and registered sex offender.  There are a multitude of collateral consequences attendant to Defendant's conviction which will significantly limit his employment, residential, social and economic choices. Thus, giving Defendant a five year sentence, which might otherwise seem too lenient given the Guideline recommendations, is wholly appropriate given the breadth and severity of the consequences which will affect every aspect of his life upon reentry into society after his incarceration.

**Forfeiture**

The PSIR suggests that Defendant's computer and related hardware be forfeited. While Defendant does not oppose deleting all pornographic images on his computer and any related apps or software or programs that would facilitate the obtaining of pornographic images, he respectfully requests this Court to permit him to retain his computer and equipment. Being of modest means, added to the uncertainty of his future job prospects because of this offense results in a likely inability to have the financial resources to purchase a computer in the future. However, with computer access, he will better be able to search for suitable employment and a residence and allow him, upon his release from prison, to put into place the structures that will help him not re-offend.

**Placement**

Defendant is requesting the Court to direct that he be incarcerated at: Lampoc, Terminal Island, Taft, or Victorville. Placement at one of these facilities would allow him to maintain connections with his family which connections, when he is released, will help facilitate his re-acclimation into civilian society, and provide him additional support as he moves forward with his life in a law-abiding manner.

Finally, Defendant suggest that the nature of his offense places him at risk at the hands of predatory or sociopathic peers in a prison setting, which could lead to maladaptive coping skills and, arguably, a higher risk status following additional victimization. Accordingly, Defendant requests this Court to consider placing him in a facility that is equipped at keeping offenders like him safe.

**Conclusion**

Given the credible medical testimony that, with appropriate treatment and supervision, Mr. Johnson does not present a risk to the public, a five year sentence with a prolonged period of supervised release under strict conditions, including continued treatment, adequately reflects the seriousness of the offense and serves the purposes of punishment in this case.

Of the constellation of these concerns that are presumably most important to the Government, it is the consideration of the need to protect the public from further crimes of the defendant that most resonates in favor of Mr. Johnson.  The evidence shows that he is remorseful, unlikely to offend again, and has an optimistic prognosis.

Even when the Sentencing Guidelines were mandatory, sentencing courts were to treat

those before them as individuals.  See <u>Koon v. United States</u>, 518 U.S. 81, 113 (1996) ("It has

been uniform and constant in the federal judicial tradition for the sentencing judge to consider

every convicted person as an individual and every case as a unique study in the human failings

that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.").  The

decision in <u>Booker</u> and the command of the statute to impose a sentence that is "sufficient, but

not greater than necessary," has given sentencing courts  greater latitude to impose a sentence

that fits not only the crime, but the person before the court. Mr. Johnson respectfully submits that

a sentence of five years would do just that consistent with this Court's statutory obligation.


Respectfully submitted,

<u>/s/ Stephen E. Sebald</u>
    Attorney for Defendant
    2503 West 26th Street
    Erie, Pennsylvania 16506
    Attorney ID. 87469